UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------------X

TERRENCE C. RIVERA,

                    Plaintiff,

        - against -

THE CITY OF NEW YORK and
KIMBERLY NORTON,

                    Defendants.

-----------------------------------------X

00 Civ. 3149 (RWS)

O P I N I O N

A P P E A R A N C E S:

        BLOOM & MINTZ, P.C.
        Attorneys for Plaintiff
        225 Broadway
        New York, NY 10007
        By:  EMANUEL BLOOM, ESQ.
             Of Counsel

        HONORABLE MICHAEL A. CARDOZO
        Corporation Counsel of the City of New York
        Attorneys for Defendants
        100 Church Street, Room 2-117
        New York, NY 10007
        By:  DONALD C. SULLIVAN, ESQ.
             CINDY E. SWITZER, ESQ.
             Of Counsel

**Sweet, D.J.,**

Defendants the City of New York (the "City") and Kimberley Norton ("Dr. Norton") (collectively, the "Defendants"), have moved pursuant to Rule 56, Fed. R. Civ. P., to dismiss the complaint of Terrence C. Rivera ("Rivera"). For the reasons set forth below, the motion is granted.

## Prior Proceedings

On April 11, 2000, Rivera filed his complaint in the Supreme Court of the State of New York, County of Kings, alleging in his first cause of action, discrimination based upon national origin, gender, heterosexuality, marital status, and veteran status, violating his rights to equal protection, due process, and civil rights; in his second cause of action the violation of his rights under the New York State Constitution, the Human Rights Law, Executive Law § 296, and the New York City Human Rights Law (New York City Administrative Code § 8-101 et seq.); and in his third cause of action tortious interference with contract, emotional distress, prima facie and wilful tort, breach of agreement, negligence misrepresentation, fraud and deceit, all to his damage in the amount of $10 million dollars, including punitive damages and attorney's fees. He alleges that the Defendants discriminated against him on the basis of his national origin ("Latin American"), sexual orientation ("Heterosexual"), gender ("male"), marital status ("married man"), and status as a veteran, in violation

of 42 U.S.C. § 1983, the New York State Human Rights Law, codified at N.Y. Exec. Law § 290 et seq. ("SHRL"), and the New York City Human Rights Law, codified at N.Y.C. Admin. Code § 8-101 et seq. ("CHRL") when they concluded in 1998 that he was then psychologically unfit for the duties of a police officer. The action was removed to this Court on April 25, 2000.

Discovery proceeded and the instant motion was heard and marked fully submitted on March 9, 2005.

**The Facts**

The facts are set forth in the Defendants' Local Rule 56.1 Statement and the Plaintiff's Response to Defendants' Rule 56.1 Statement and are not in dispute except as noted below.

In early 1998, Rivera applied for the position of police officer with the New York City Police Department ("NYPD"). He took Civil Service Exam No. 7053 and ranked 28 out of 16,082. After taking the written police exam, he was contacted by an NYPD investigator who informed him that he scored highly on the examination and recommended that Rivera try entering the police academy class beginning in September 1998. Rivera received a letter stating "steps to being accepted to the academy."

The Notice of Examination for Exam No. 7053 stated that police officer candidates were subject to psychological tests and that eligible candidates would be rejected for any psychological condition which impaired their ability to perform the duties of a police officer in a reasonable manner, or which would reasonably be expected to render them unfit to continue to perform those duties in a reasonable manner.

On August 19, 1998, Rivera was examined by an NYPD psychologist, Dr. Norton, to determine whether he was psychologically suitable for employment as a police officer. In her report of December 1, 1998 ("Dr. Norton Report"), Dr. Norton noted that Rivera had reported that he recently separated from his wife, that he felt "down" about that for a while, and that "while [Rivera] did not go into much detail about the substance of the marital discord, managing his family life and his job became so stressful that he left the Navy under a hardship discharge" (Dr. Norton Report at 131). She also reported that after he was discharged from the military in early 1998, Rivera claimed he had difficulty sleeping for two weeks. In describing his then-recent discharge and separation from his wife, Dr. Norton noted that Rivera apparently had "difficulty handling the interpersonal stress of his marriage and the responsibilities of his job, and he admitted to feeling down around the time of recent marital and job separation." (Id.). Dr. Norton also noted that Rivera told her that when he was eight years old, he observed his father physically abuse his mother, and that as a result, he experienced nightmares and had difficulty sleeping for several months after the incident. (Id.).

4

Dr. Norton concluded that Rivera's childhood experience raised "concern about his ability to tolerate the stress of police work" (_id._ at 134) and that during the interview Rivera "came across as more anxious than most PO Cds [police officer candidates].  He had very little eye contact during the interview even after being asked to try to maintain some eye contact" (_id._ at 133), and that "at this point, the cd [candidate] is still adjusting to the stress of his marital separation."  He said, "it's still bugging me."  "He agrees that he still felt down now.  Thus the marital situation is unresolved currently."  (_Id._ at 134).

Dr. Norton also noted that Rivera also said about his current unemployment, he was "trying to adjust to civilian life" (_id._), and she concluded that Rivera was "currently experiencing stress and adjustment problems, as evidenced by his life history and interview behavior" (_Id._ at 133) and determined that Rivera was not psychologically suited to perform the duties of a police officer at that time.  (_Id._ at 134).  According to Rivera, Dr. Norton's conclusions were false and pretextual, and he has challenged her report of the interview as inaccurate, biased, and marked by ill will.

Following standard procedure, after Dr. Norton's conclusion, the Director of Psychological Services, Dr. Eloise Archibald, reviewed Rivera's psychological folder and concluded that Dr. Norton's decision to reject Rivera as psychologically unsuited for police work should be sustained.

Rivera was informed by letter dated January 14, 1999 that he had not met the requirements for the position of police officer and advised him of his right to appeal his disqualification.

Rivera appealed his disqualification and retained a psychologist, Dr. Robert Daley, to submit a report on his behalf. Dr. Daley concluded Rivera qualified, with no patterns of dysfunctional behavior.

As a part of the NYPD's internal appeal process, the contents of the NYPD's Psychological Services Record on Rivera and Dr. Daley's December 23, 1999 report were submitted to an outside consultant, Dr. Robert Arko, for review.

After reviewing the records, Dr. Arko concluded the new material submitted by Rivera's doctor was insufficient to mandate changing the original recommendation for rejection. Accordingly, in his report dated January 21, 2000, Dr. Arko recommended that Rivera's appeal be denied.

Rivera then pursued his appeal to the New York City Civil Service Commission, and while that appeal was pending, Rivera was re-interviewed by another NYPD psychologist, Dr. Dayle Schwarzler, on February 4, 2002.

During the period between his initial psychological interview in August 1998 and his second interview in February 2002, Rivera had attended Hunter College from January to June 1999, worked for the New York Blood Center from June 1999 to January 2001, and was appointed a firefighter with the New York City Fire Department ("FDNY") in February 2001. According to Rivera, his performance in these jobs and while in the United States Navy has been exemplary and free from stress-related problems. He was found qualified to be a firefighter and to be without psychiatric disorder by the FDNY psychiatrist.

Dr. Schwarzler determined that the psychological issues previously identified had been satisfactorily resolved, and recommended that Rivera's disqualification be rescinded. In early 2002, Rivera was reinstated on the eligibility list for police officer candidates, and the NYPD offered to start processing his application again.

Rivera withdrew his application from the NYPD and had his name removed from the list of eligible police candidates. He has alleged economic loss of $146,000.

During his deposition in this action, Rivera stated that he had no specific evidence regarding Dr. Norton's alleged discrimination and stated that he simply had "just the feeling that there was nothing to disqualify [him], so there had to be another factor." (Rivera Depo. 94-95).

During his deposition, Rivera was asked the following questions and gave the following answers:

> Q: Now, do you have the opinion that Dr. Norton was biased against you because of your Latin background?
>
> A: I feel it was definitely not based on my qualifications. It seemed like I was over-qualified for the job. I felt this was something, either racially or otherwise, motivated for her.
>
> Q: Is there anything specific that makes you think that she was racially motivated?
>
> A: She didn't say ... . Nothing specific.

(Depo. at 93-94).

* * *

> Q: Is there any information you have that might lead to the conclusion that she was biased against you because you were married?
>
> A: Just on the same grounds. On pretty much by the racial, just the feeling that there was nothing to disqualify me, so there had to be another factor.

(Depo. at 94).

* * *

> Q: Do you have any information that would lead a person to the conclusion that she was biased against you because you were heterosexual?
>
> A: Nothing specific, no.

(Depo. at 94).

* * *

> Q: Do you have any information tending to show that Dr. Norton was biased against you because you were male?
>
> A: Nothing specific.
>
> Q: The same question, tending to show that she was biased against you because you had service in the armed forces?
>
> A: Just by the way any time I mentioned military she would cut me off. Didn't mention it at all during my interview.

(Depo. at 95).

When Rivera was asked for specific information regarding an NYPD custom, policy, or practice of discrimination, he responded, "Just from what I read, you know, discrimination cases, and pattern of -- not the same thing, but just a pattern of discrimination throughout the department." (Rivera Depos. at 95-96).

Rivera filed a Notice of Claim on April 14, 1999, alleging violation of his rights under the United States Constitution, New York Constitution, Federal Civil Rights Law, New York Human Rights Law, and breach of duty, breach of agreement and wilful tort, and did not include allegations of intentional or negligent infliction of emotional distress, tortious interference with contract, prima facie tort, negligent misrepresentation, or fraud and deceit.

**The Applicable Summary Judgment Standard**

Pursuant to Rule 56, summary judgment may be granted only if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); <u>SCS Communications, Inc. v. Herrick Co., Inc.</u>, 360 F.3d 329, 338 (2d Cir. 2004). The court will not try issues of fact on a motion for summary judgment, but rather, will determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986).

Summary judgment is appropriate where the moving party has shown that "little or no evidence may be found in support of the nonmoving party's case. When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." <u>Gallo v. Prudential Residential Servs., Ltd. P'ship</u>, 22 F.3d 1219, 1223-24 (2d Cir. 1994) (internal citations omitted). If, however, "'as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper.'" <u>Security Ins. Co. of Hartford v. Old Dominion Freight Line Inc.</u>, 391 F.3d 77, 83 (2d Cir. 2004) (quoting <u>Gummo v. Village of Depew</u>, 75 F.3d 98, 107 (2d Cir. 1996)).

The moving party has the burden of showing that there are no material facts in dispute, and the court must resolve all ambiguities and draw all reasonable inferences in favor of the party opposing the motion. Bickhardt v. Ratner, 871 F. Supp. 613 (S.D.N.Y.1994) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)). Thus, "summary judgment may be granted if, upon reviewing the evidence in the light most favorable to the non-movant, the court determines that there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law." Richardson v. Selsky, 5 F.3d 616, 621 (2d Cir.1993).

A material fact is one that would "affect the outcome of the suit under the governing law," and a dispute about a genuine issue of material fact occurs if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248; R.B. Ventures, Ltd. v. Shane, 112 F.3d 54, 57 (2d Cir.1997).

"The salutary purposes of summary judgment -- avoiding protracted, expensive and harassing trials -- apply no less to discrimination cases than to commercial or other areas of litigation." Nicastro v. Runyon, 60 F. Supp. 2d 181, 183 (S.D.N.Y. 1999) (citing Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988)). Greater caution must be exercised, however, in granting summary judgment in employment discrimination cases where the employer's intent is genuinely in issue. Belfi v. Prendergast, 191 F.3d 129, 135 (2d Cir. 1999). This is so because "employers are rarely so cooperative as

to include a notation in the personnel file that the [action complained of] is for a reason expressly forbidden by law." Bickerstaff v. Vassar College, 196 F.3d 435, 448 (internal quotation marks and citation omitted; brackets in the original).  But even where an employer's intent is at issue, "a plaintiff must provide more than conclusory allegations of discrimination to defeat a motion for summary judgment." Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997); Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir. 1985).

The same analytical framework used for evaluating a Title VII discrimination claim applies to Rivera's claims under § 1983, the SHRL, and the CHRL.  See Annis v. County of Westchester, 136 F.3d 239, 245 (2d Cir. 1998) (applying the burden shifting framework of Title VII to § 1983 claims); Song v. Ives Labs., Inc., 957 F.2d 1041, 1046 (2d Cir. 1992) (state claims); Abdu-Brisson v. Delta Air Lines, 239 F.3d 456, 466 (2d Cir. 2001) (SHRL and CHRL claims), cert. denied, 534 U.S. 993, 122 S.Ct. 460 (2001).

Under the framework set forth by the Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff asserting a claim of discrimination must first establish a prima facie case.  To establish a prima facie case, a plaintiff must point to record evidence showing that: (1) he is a member of a protected class; (2) he applied for and was qualified for a job for which the employer was seeking applicants; (3) despite his qualifications, he was rejected; and (4) his rejection occurred in circumstances giving rise

to an inference of discrimination on the basis of his membership in that protected class. McDonnell Douglas, 411 U.S. at 802; Rosen v. Thornburgh, 928 F.2d 528, 531 (2d Cir. 1991); Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir. 1985), cert. denied, 474 U.S. 829 (1985). If that prima facie case is established, the burden of production, but not persuasion, shifts to the employer to set forth a legitimate non-discriminatory reason for the non-selection. St. Mary's Honor Society v. Hicks, 509 U.S. 502, 509 (1993). Once the employer has met its burden of showing a legitimate, non-discriminatory reason for the employment action, the employee must then show that the reason advanced is pretextual -- i.e., that it masks the employer's true discriminatory reason for its actions. See Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 254-56 (1981).

## Rivera Has Not Established A Prima Facie Case of Employment Discrimination

As a preliminary matter, it remains unsettled in this Circuit whether a plaintiff who is in a majority group, as is Rivera here with respect to his claims that he was discriminated against because he is a married heterosexual male, must allege special circumstances to assert a discrimination claim, e.g., that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority." Olenick v. N.Y. Tel., 881 F. Supp. 113, 114 (S.D.N.Y. 1995) (adopting the requirement for majority plaintiffs), citing Parker v. Baltimore & Ohio R.R. Co., 652 F.2d 1012,

1017 (D.C. Cir. 1981). But see Tappe v. Alliance Capital Mgmt., 177 F. Supp. 2d 176, 181 (S.D.N.Y. 2001) (rejecting the heightened requirement in "reverse discrimination" cases).

Further, there is no basis for Rivera to bring § 1983 claims of alleged discrimination on the basis of either his status as a veteran or his marital status. Phillips v. Merchants Ins. Group, 990 F. Supp. 99, 101 (N.D.N.Y. 1998) (no claim under § 1983 based on Vietnam Era veteran status); Philippeaux v. North Cent. Bronx Hospital, 871 F. Supp. 640, 648 (S.D.N.Y. 1994) (same) aff'd in an unpublished opinion, 104 F.3d 353 (2d Cir. 1996), decision reported in full at 1996 U.S. App. LEXIS 3076 (2d Cir. Nov. 22, 1996), cert. denied, 117 S.Ct. 1110 (1997); Julian v. New York City Transit Authority, 857 F. Supp. 242, 250 n.2 (E.D.N.Y. 1994) (no claim under § 1983 based on marital status), aff'd in an unpublished opinion, 52 F.3d 312 (1995).

**Procedural Due Process**

Plaintiff has alleged that the NYPD failed to provide a meaningful appeal in violation of the procedural due process guarantee of the Fourteenth Amendment. The Second Circuit has stated that the elements of a procedural due process claim are as follows: (1) that the plaintiff possessed a constitutionally protected interest, (2) that such interest was deprived as a result of government action, (3) and that the deprivation occurred without constitutionally adequate pre- or post-deprivation process. N.Y. State NOW v. Pataki, 261 F.3d 156, 163

(2d Cir. 2001) (citing Logan v. Zimmerman Brush Co., 455 U.S. 422, 428, 71 L. Ed. 2d 265, 102 S. Ct. 1148 (1982)).

On this record, Rivera has presented a factual issue as to his qualification as a police officer. Although three different psychologists, namely, Dr. Norton, another NYPD psychologist, and an outside consultant, all concluded that, as of January 2000, Rivera was not qualified to be considered for a position as a police officer, Dr. Daley's report and the subsequent examinations of Rivera present a factual issue as to his qualification.

However, Rivera has not established that Defendants made a final rejection of him for this position. His disqualification was rescinded and he was restored to the eligibility list after which he withdrew his application from the NYPD and had his name removed from the list of eligible police candidates.

According to the Defendants, there is no property interest in appointment or in being found psychologically suited for police work. NOW v. Pataki, 261 F.3d at 164 (2d Cir. 2001) ("Where, as here, a purported property interest is contingent on the exercise of executive discretion, no legitimate claim of entitlement exists."). In McMenemy v. City of Rochester, 241 F.3d 279, 287-88 (2d Cir. 2001), the Circuit held that there was no constitutionally cognizable interest in a competitive examination. The Circuit has also held that even an employee of the City serving a probationary period does not have a

constitutionally cognizable interest in employment and therefore need not be provided with any particular process in the course of the employee's dismissal from service. <u>Finley v. Giacobbe</u>, 79 F.3d 1285, 1296 (2d Cir. 1996); <u>see</u> <u>Jannsen v. Condo</u>, 101 F.3d 14 (2d Cir. 1996). It also has long been held that an applicant for a job has no property interest in the job. <u>MacFarlane v. Grasso</u>, 696 F.2d 217, 221-22 (2d Cir. 1982).

Rivera has cited <u>Locurto v. Giuliani</u>, 269 F. Supp. 2d 368 (S.D.N.Y. 2000), as support for his due process clause claim. In that case, however, unlike in the present case, the three city employees had been appointed to titles in the City's police and fire services. The <u>Locurto</u> plaintiffs had a property interest in their jobs and had a right to pre-deprivation process before being deprived of that constitutionally cognizable interest. <u>See</u> <u>Cleveland Board of Education v. Loudermill</u>, 470 U.S. 532, 546 (1985).

Rivera has focused primarily on the question of whether the initial decision made by the NYPD was correct or not. (Rivera's Memo at 9-17). Defendants have conceded for purposes of this summary judgment motion that there is a genuine issue of fact concerning the correctness of the initial decision that Rivera was not psychologically suited to police work. The Constitution does not guarantee that the executive branch will always exercise its discretion to arrive at a correct decision. <u>Bishop v. Wood</u>, 426 U.S. 341, 349-50 (1976) ("The

Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions.").

In any event, Rivera received procedural due process. Dr. Norton's Report was reviewed, the disqualification was appealed, Rivera submitted the report of Dr. Daley, an outside consultant reviewed both Dr. Daley's report and NYPD's Psychological Services Record, and Rivera appealed to the Civil Service Commission, a process that included yet another psychological review by Dr. Schwarzler, and a full evidentiary hearing was also ordered. (Rivera's Memo at 13-14). Even assuming Rivera did have a property interest in employment, under the Parratt-Hudson line of cases, this extensive post-deprivation process would be more than adequate to provide Rivera with all the process due. See McMenemy, 241 F.3d at 289; Parratt v. Taylor, 451 U.S. 527 (1981), overruled in part on other grounds, Daniels v. Williams, 474 U.S. 327 (1986); see also Hudson v. Palmer, 468 U.S. 517 (1983).

**Substantive Due Process**

"Substantive due-process rights guard against government's exercise of power without any reasonable justification in the service of a legitimate governmental objective." Tenenbaum v. Williams, 193 F.3d 581, 600 (2d Cir. 1999) (citing County of Sacramento v. Lewis, 523 U.S. 833, 843, 140 L. Ed. 2d 1043, 118 S. Ct. 1708 (1998)) (internal quotation marks omitted).

In the instant case, Rivera essentially has claimed that because the decision to psychologically disqualify him was "wrong" that his right to substantive due process was violated.  As the Circuit has held, substantive due process is not a "catchall" designed to review every exercise of discretion by the coordinate branches of government.  Natale v. Town of Ridgefield, 170 F.3d 258, 259 and 263 (2d Cir. 1999) ("Substantive due process standards are violated only by conduct that is so outrageously arbitrary as to constitute a gross abuse of governmental authority."); Kaluczky v. White Plains, 57 F.3d 202, 211 (2d Cir. 1995) ("[s]ubstantive due process protects against government action that is arbitrary, conscience shocking or oppressive in a constitutional sense but not against government action that is "incorrect or ill-advised").  Rivera must show more than that the Defendants were simply wrong.  Rivera has failed to show that there could not possibly be any debate about the issue and that the decision itself was a gross abuse of governmental power.

**Equal Protection**

To show that there has been a violation of the Equal Protection Clause, Rivera must show that the Defendants' decision was motivated by discriminatory animus.  Personnel Administrator v. Feeney, 442 U.S. 256 (1979).

Rivera seeks to prove an equal protection violation based upon a "class of one" or to allege selective prosecution.  See Rivera's

Memo at 17 (citing Village of Willowbrook v. Olech, 528 U.S. 562 (2000) (per curiam) (a valid equal protection claim may be brought by a "class of one" "where the plaintiff alleges that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment."); and LeClair v. Saunders, 627 F.2d 606, 608 (2d Cir. 1980), cert. denied, 450 U.S. 959 (1981)). The Second Circuit has repeatedly held that viable selective enforcement claims based on the Equal Protection Clause require proof that (1) the person, compared with others similarly situated, was selectively treated; and (2) that such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person. LeClair, 627 F.2d at 609; Zahra v. Town of Southold, 48 F.3d 674, 683 (2d Cir. 1995).

Rivera has not submitted evidence of "malicious or bad faith intent" on the part of Dr. Norton or the NYPD. He has alleged that Dr. Norton seemed angry and agitated while evaluating him; that she harassed him and did not let him answer certain questions; and that she did not want him to talk about his life in the Navy. (Rivera's Memo at 3). Such allegations of malice do not support an Equal Protection claim. See LeClair, 627 F.2d at 610-11 (holding that six elements of evidence, including that the inspector was in a spiteful mood due to an earlier incident with another farmer and performed an unusually detailed inspection did not constitute a showing that he acted maliciously or with intent to injure); Bizzarro v. Miranda, 394 F.3d

82, 87 (2d Cir. 2005) (holding that while defendant was "enraged," "engulfed with anger" and was "screaming" at plaintiff, there was not a showing that he acted out of personal animus).

After the Court's holding in Olech, there has been some debate as to whether there still exists a requirement that there be a showing of deliberate malicious intent, but the Second Circuit has not yet abandoned it. See Giordano v. City of New York, 274 F.3d 740, 750-51 (2d Cir. 2001). In any case, under Olech, Rivera must still show not only that the Defendants' actions were irrational and wholly arbitrary, but also that Defendants intentionally treated him differently from others similarly situated without any rational basis for the difference in treatment. 528 U.S. at 564; Giordano, 274 F.3d at 751. The case Rivera has cited, Millar v. Ojima, 354 F. Supp. 2d 220 (E.D.N.Y. 2005), is of no avail, as it holds that both prongs of the LeClair test must be satisfied, and Rivera in this case has not made a showing similar to the plaintiffs in Millar.

Furthermore, even if Rivera had been treated differently than a similarly situated individual, Rivera has not established that Defendants' actions lacked a rational basis. See Bizzarro, 394 F.3d at 88-89 ("Olech does not empower federal courts to review government actions for correctness. Rather, an Olech-type equal protection claim focuses on whether the official's conduct was rationally related to the accomplishment of the work of their agency.").

**Rivera Has Not Established That He Suffered An Adverse Employment Action**

Rivera contends that Dr. Norton's original determination constituted an actionable adverse employment action and that the resulting disqualification was not temporary. "There is no Title VII violation absent a materially adverse change in the terms and conditions of employment." McKenney v. New York City Off-Track Betting Corp., 903 F. Supp. 619, 623 (S.D.N.Y. 1995).

In Davis v. City University of New York, 1996 U.S. Dist. LEXIS 6345 (S.D.N.Y. 1996), the court held that Davis' allegations that defendants "delayed and nearly succeeded in depriving her" of tenure, and "attempted to improperly block" her promotion, were insufficient to establish an adverse employment action. Although an outright denial of a promotion would constitute an adverse employment action, the court held that because Davis eventually received the promotion, she had not established a prima facie case of discrimination. The court stated:

> The eventual grant of tenure and a promotion to Davis, even if after a delay, and even if that delay were due to discrimination or retaliation, contradicts her claim that she suffered a materially adverse change. Her allegations therefore do not make out a prima facie case under Title VII, § 1981, or the HRL, and the tenure and promotion claims made pursuant to those provisions must be dismissed.

Davis at *24. See also Galabya v. New York City Board of Education, 202 F.3d 636, 640 (2d Cir. 2000) (delay in reassignment does not

constitute adverse employment action); <u>Evans v. City of New York</u>, 2003 U.S. Dist. LEXIS 18281, *31-32 (S.D.N.Y. Oct. 9, 2003) (eleven-month delay in processing salary increase is not an adverse employment action).

Even if it is assumed that the initial psychological disqualification did constitute an adverse employment action, a refusal to hire, Rivera has not established that it took place under circumstances giving rise to an inference of discrimination. Examples of how a plaintiff could show that the circumstances support an inference of discrimination have been set forth in <u>Chambers v. TRM Copy Ctr. Corp.</u>, 43 F.3d 29, 37 (2d Cir. 1994), including the sequence of events leading to discharge; more favorable treatment of others outside the protected group; degrading comments made in criticism of plaintiff's job performance; and invidious comments regarding others in plaintiff's protected group.

No allegedly discriminatory remark is attributed to Dr. Norton. Rivera has contended that Dr. Norton possessed an angry demeanor towards him and persisted in trying to solicit more specific responses to questions posed to him and became agitated when Rivera failed to pay attention to her. (Rivera's Depo. at 64-65). When asked the basis for believing that Dr. Norton's demeanor and subsequent negative evaluation were motivated by discrimination, Rivera replied that he had "nothing specific" to support his allegations and that he

simply had "the feeling that there was nothing to disqualify [him], so there had to be another factor." (Rivera's Depo. at 94-95).

In the absence of evidence that Dr. Norton, or anyone else at the NYPD, acted against Rivera for discriminatory reasons, Rivera has not stated a prima facie case. See Stern v. Trustees of Columbia University, 131 F.3d 305, 311-12 (2d Cir. 1997).

## Rivera Has Not Established A Pretext For Discrimination

Under the burden-shifting analysis set forth above, if a plaintiff establishes a prima facie case, the burden of production, but not persuasion, shifts to the employer, to show that any adverse employment actions were taken for legitimate, nondiscriminatory reasons. St. Mary's Honor Society v. Hicks, 509 U.S. 502, 509 (1993). Once the defendant produces such evidence, "the presumption raised by the prima facie case is rebutted, and drops from the case." Id. at 511. At that point, the governing standard is simply whether the evidence, taken as a whole, is sufficient to support a reasonable inference that prohibited discrimination occurred." James v. New York Racing Ass'n., 233 F.3d 149, 156 (2d Cir. 2000). Here, even if Rivera had met his prima facie burden, the Defendants have met their burden of production, and Rivera has not shown that a reasonable jury could find that the Defendants' proffered reasons are a pretext for discrimination.

The reasons for disqualifying Rivera from consideration for the position of police officer have been established to include: Dr. Norton's observations and conclusions relating to stress tolerance, his recent separation, his recollections and reactions in early childhood, Dr. Norton's view of Rivera's demeanor and anxiety. Dr. Norton's conclusions were supported by both another NYPD psychologist and an outside consultant. Accordingly, the Defendants have met their minimal burden of setting forth legitimate, nondiscriminatory reasons for the employment actions taken against Rivera. See Pimentel v. City of New York, 2001 U.S. Dist. LEXIS 20426, *23, 87 Fair Empl. Prac. Cas. (BNA) 960 (S.D.N.Y. 2001) aff'd, 74 Fed. Appx. 146 (2d Cir. 2003).

Rivera in response has offered only conclusory allegations. Such allegations are insufficient, as a matter of law, to bring his case to a jury. See Hawana v. City of New York, 230 F. Supp. 2d 518, 528 (S.D.N.Y. 2002)(noting that defendants' explanation is buttressed when the record shows that multiple persons support the allegedly adverse employment decision); Gorham v. Transit Workers Union Local 100, 1999 U.S. Dist. LEXIS 3573, *12 (S.D.N.Y. Mar. 22, 1999), aff'd without published opinion, 205 F.3d 1322 (2d Cir.), cert. denied, 531 U.S. 884 (2000).

As shown in the excerpts of his deposition, Rivera's allegations that Dr. Norton was annoyed, agitated, and hostile during the interview are insufficient to support a claim of discrimination.

See <u>Jetter v. Knothe Corp.</u>, 200 F. Supp. 2d 254, 266 (S.D.N.Y. 2002), <u>aff'd</u>, 324 F.3d 73 (2d Cir. 2003); <u>Hawana</u>, 230 F. Supp. 2d at 538.

As the Second Circuit recently observed:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived) disability; and many bosses are harsh, unjust, and rude ... . It is therefore important in [alleged discrimination] ... cases to exclude from consideration personnel decisions that lack a linkage or correlation to the claimed ground of discrimination. Otherwise the federal courts will become a court of personnel appeals.

<u>Alfano v. Costello</u>, 294 F.3d 365, 377 (2d Cir. 2002).

Accordingly, Rivera's claims under § 1983, the SHRL, and the CHRL are dismissed.

## **Rivera Has Not Established Monell Liability**

To hold a municipal entity liable under § 1983 for the unconstitutional acts of its employees, a plaintiff must plead and prove that his constitutional rights were violated, that the alleged actions by the employees were the result of an official policy, custom, or practice of the municipal defendant, and that the policy, custom, or practice caused the plaintiff's alleged injuries. <u>City of Canton, Ohio v. Harris</u>, 489 U.S. 378, 385 (1989); <u>Monell v. New York City Dep't of Social Servs.</u>, 436 U.S. 658, 690-95 (1978); <u>McDonald v. Board of</u>

<u>Education</u>, 2003 U.S. Dist. LEXIS 11338, *8 (S.D.N.Y. July 31, 2003).
Proof of a single incident of unconstitutional activity is insufficient
to demonstrate the existence of a policy. <u>City of Oklahoma v. Tuttle</u>,
471 U.S. 808, 821 (1985).

Here, the City is not liable because there was no underlying
violation. <u>City of Los Angeles v. Heller</u>, 475 U.S. 796 (1986)
<u>rehearing denied</u>, 476 U.S. 1154 (1986). Moreover, there is no evidence
that any alleged unconstitutional acts were part of a municipal policy,
practice, or custom. Rivera has not even alleged what policy,
practice, or custom caused his injuries, much less presented any
evidence to support such an allegation. Indeed, there is no record
evidence even to suggest that other persons of Latin American national
origin, other males, other heterosexuals, and/or other married persons
were denied positions as police officers. Finally, the fact that
Rivera's temporary disqualification was rescinded by the NYPD
eviscerates any otherwise applicable claim of municipal liability. <u>See</u>
<u>McDonald</u>, 2003 U.S. Dist. LEXIS 11338, *16-17. Accordingly, the § 1983
claims against the City are dismissed.

## The Common Law Claims Are Dismissed

### Contract Claim

Although Rivera has alleged that several weeks after taking the written police exam in 1998 he was contacted by an NYPD investigator who informed him that he scored highly on the examination and recommended that he try entering the police academy class beginning in September 1998, and that shortly after his initial phone conversation with the NYPD investigator he received a letter stating "steps to being accepted to the academy," Rivera has not alleged that this letter included any definitive terms of employment. At most, the NYPD encouraged Rivera to move forward in taking the necessary steps to becoming an officer. Accordingly, his contract claim fails as a matter of law. See O'Reilly v. Citybank, N.A., 603 N.Y.S.2d 572, 573 (2d Dep't. 1993) (no employment contract exists where there is no record evidence that the employee would be guaranteed a position).

### Promissory Estoppel Claim

Rivera also has not established a claim of promissory estoppel. In New York, the party asserting estoppel must prove (1) lack of knowledge of the true facts; (2) reliance upon the conduct of the party estopped; and (3) a prejudicial change in his position. BWA Corp. v. Alltrans Express U.S.A., Inc., 112 A.D.2d 850, 853 (App. Div. 1st Dep't 1985) (quoting Airco Alloys Div. v. Niagra Mohawk Power

<u>Corp.</u>, 76 A.D.2d 68, 81-82). Rivera has not demonstrated that the City made false representations or concealed "material facts," which were "calculated to convey the impression that the facts [were] otherwise than and inconsistent with, those which the party subsequently seeks to assert." <u>Id.</u> (quoting 21 N.Y. Jur., Estoppel, § 21). Rivera has offered no evidence to suggest that the statements by NYPD employees were calculated to mislead him into believing he was guaranteed employment. In addition, the First Department has held that, as a matter of law, "change of job or residence, by itself, is insufficient to trigger invocation of the promissory estoppel doctrine." <u>Cunnison v. Greenshields Securities, Inc.</u>, 107 A.D.2d 50, 53 (1st Dep't. 1985) (citing <u>Ginsberg v. Fairfield-Noble Corp.</u>, 81 A.D.2d 318, 321). Rivera has conceded that he applied for a hardship discharge not solely because of any promises or statements made by the City or its agents, but because he was concerned that his wife "was suffering from depression . . . and she was calling me pretty much stressed out . . . ." (Rivera Dep. at 89). Notwithstanding the reasons for his withdrawal from military service, changes of job or residence do not satisfy the requirements for a claim of promissory estoppel.

## Intentional Infliction Of Emotional Distress

Rivera has not stated a claim against the City for intentional infliction of emotional distress because "[i]t is well-settled that public policy bars claims sounding in intentional infliction of emotional distress against a governmental entity." Lauer v. City of New York, 240 A.D.2d 543, 659 N.Y.S.2d 57, 58 (2d Dep't. 1997), appeal denied, 91 N.Y.2d 807, 669 N.Y.S.2d 260 (1998).

Rivera's claim of intentional infliction of emotional distress also fails because he did not identify this cause of action on his Notice of Claim and, therefore, the claim is stricken. See Urena v. City of New York, 221 A.D.2d 429 (2d Dep't. 1995) (plaintiff's complaint is limited to causes of action set forth in notice of claims); Velaire v. City of Schenectady, 235 A.D.2d 647, 648 (3rd Dep't.), appeal denied, 89 N.Y.2d 816 (1997); Sorge v. New York, 56 Misc. 2d 414 (Sup. Ct. N.Y. County 1968).

Moreover, to state a claim for intentional infliction of emotional distress against Dr. Norton, Rivera must establish (i) extreme and outrageous conduct, (ii) with the intent to cause emotional distress, (iii) a causal connection between the conduct and the alleged injury, and (iv) that he has suffered severe emotional distress. New York strictly applies each of these elements. Howell v. New York Post Co., Inc., 81 N.Y.2d 115, 121, 596 N.Y.S.2d 350, 353 (1993); Ahmed v. Gelfand, 160 F. Supp. 2d 408, 416 (E.D.N.Y. 2001). The same standard

applies to claims of negligent infliction of emotional distress. <u>Wilson v. City of New York</u>, 294 A.D.2d 290, 295, 743 N.Y.S.2d 30, 34 (1st Dep't. 2002); <u>Dillon v. City of New York</u>, 261 A.D.2d 34, 41, 704 N.Y.S.2d 1, 7 (1st Dep't. 1999).

For conduct to be sufficiently "extreme and outrageous" to give rise to a claim for intentional infliction of emotional distress, it must be "so outrageous in character and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized society." <u>Murphy v. American Home Products Corp.</u>, 58 N.Y.2d 293, 303, 461 N.Y.S.2d 232, 236 (1983); <u>see</u> <u>Howell</u>, 81 N.Y.2d at 122, 596 N.Y.S.2d at 353. ("Indeed, of the intentional infliction of emotional distress claims considered by this Court, every one has failed because the alleged conduct was not sufficiently outrageous."); <u>Freihofer v. Hearst Corp.</u>, 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735, 741 (1985); <u>Fischer v. Maloney</u>, 43 N.Y.2d 553, 557, 402 N.Y.S.2d 991, 993 (1978). Moreover, the Second Circuit interprets New York law as requiring that the conduct which allegedly caused the emotional distress be intentionally directed at Rivera without any reasonable justification; a showing of gross recklessness is insufficient and the conduct usually must involve a continuous course of harassment, rather than a single instance of abuse. <u>Levin v. McPhee</u>, 917 F. Supp. 230, 242-43 (S.D.N.Y. 1996) (holding claim that party defamed plaintiff by alleging complicity in a murder insufficient to make out a claim of intentional infliction of emotional distress), <u>aff'd</u>, 119 F.3d 189 (2d Cir. 1997).

At most, Rivera has claimed that Dr. Norton seemed to be angry and agitated during the August 19, 1998 screening interview. (Rivera Depo. at 64). This alleged conduct on the part of Dr. Norton clearly falls short of the strict standard required by courts in claims of intentional or negligent infliction of emotional distress.

Finally, Rivera's claims for intentional infliction of emotional distress is barred by the one-year statute of limitations. CPLR 215; <u>Kwarren v. American Airlines</u>, 303 A.D.2d 722, 723 (2d Dep't. 2003) ("cause of action to recover damages for intentional infliction of emotional distress is barred by the one-year statute of limitations").

## Tortious Interference

As noted above, Rivera's failure to identify the tortious interference on his Notice of Claim is also fatal to his tortious interference claim as against the City. Further, to prove tortious interference with a contract, four elements must be shown: (1) the existence of a valid contract between the plaintiff and a third party, (2) the defendant's knowledge of that contract, (3) the defendant's intentional procuring of the breach of that contract, and (4) damages caused by the breach. <u>Kronos, Inc. v. AVX Corp.</u>, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 934 (1993). Rivera has failed to establish or even allege that he had a contract with a third party or that the Defendants had knowledge of such a contract and procured its breach. Further, to

intentional, willful, malicious and in gross and reckless disregard of the rights and sensibilities of plaintiff.

Additionally, "[a] claim of prima facie tort does not lie where the defendant's action has any motive other than a desire to injure the plaintiff." Global Casting Indus. v. Daley-Hodkin Corp., 105 Misc. 2d 517, 522 (Sup. Ct. Nassau Co. 1980) (citations omitted). Further, the New York Court of Appeals has noted that courts have limited the use of prima facie tort observing that it "should not become a 'catch-all' alternative for every cause of action which cannot stand on its own legs." Freihofer v. Hearst Corp., 65 N.Y.2d 135, 143, 490 N.Y.S.2d 735 (1985) (quoting Belsky v. Lowenthal, 62 A.D.2d 319, 323 (1st Dep't. 1978), aff'd, 47 N.Y.2d 820 (1978). Here, the lack of evidence requires that this claim be dismissed.

## Conclusion

For the reasons set forth above, summary judgment is granted in favor of Defendants and the complaint of Rivera is dismissed.

It is so ordered.

New York, NY
October    11  , 2005

_____
ROBERT W. SWEET
U.S.D.J.